Scott Halsey sued Dillard's, Inc. (hereinafter "the employer"), seeking to recover workers' compensation benefits for alleged injuries to his knees and left shoulder sustained in the line and scope of his employment on December 9, 1999. The employer answered Halsey's complaint and denied liability. Following the presentation of ore tenus evidence, the trial court entered a judgment on May 14, 2003, determining that Halsey's injuries, including the injuries to his left shoulder and left knee, were compensable and finding Halsey had sustained a 70% permanent partial vocational impairment as a result of the December 9, 1999, work-related injuries. In so finding, the trial court stated, in pertinent part:
 "Four days after his accident, [Halsey] saw an orthopedic surgeon, Dr. Jack Moore, for his injuries. He complained mainly of pain and swelling in his right knee and mentioned other minor muscle strains. After obtaining an MRI, Dr. Moore diagnosed a meniscal tear in [Halsey's] right knee. He performed surgery on January 7, 2000, to correct the tear. . . . Dr. Moore placed him at maximum medical improvement as of August 23, 2000, and assigned a 2% permanent partial impairment to [Halsey's] right lower extremity and a 1% whole person permanent partial impairment. . . .
 "At the time of the accident, [Halsey] grabbed and held on to the platform with his left arm to keep from falling to the floor. He first mentioned left shoulder pain and stiffness to Dr. Moore on March 15, 2000. Dr. Moore found some limitation of motion, impingement signs and inflammation of the subacromial space of [Halsey's] left shoulder. He diagnosed a rotator cuff strain with secondary impingement. He administered an injection into the shoulder joint and ordered physical therapy for that injury. In Dr. Moore's opinion, the injury to [Halsey's] left shoulder was related to the December 9, 1999, on-the-job accident. Because [the employer] refused to authorize treatment of this injury, Dr. Moore performed no follow-up treatment and could assign no impairment rating. The Court finds from the evidence that [Halsey's] injury to his left shoulder resulted from the accident which occurred while he worked for [the employer]. While he is entitled to medical treatment for his left shoulder at [the employer's] expense, the evidence is insufficient for the Court to determine the permanency, if any, of this injury.
 "During his service in the Air Force during the 1970's, [Halsey] injured his left knee. The Veterans Administration awarded him a 10% disability for this injury. It did not impair or restrict his ability to work before the December 9, 1999, accident. While this accident did not result in direct injury to [Halsey's] *Page 1144 
left knee, he began experiencing pain and weakness in that knee during the months when he was convalescing from the surgeries to his right knee. Dr. Moore attributed the left knee problem to the change in [Halsey's] gait and weight shifting to compensate for pain, weakness and instability caused by the right knee injury after December 9, 1999. In his opinion, the on-the-job injury to [Halsey's] right knee definitely aggravated or exacerbated the pre-existing left knee injury suffered many years earlier by [Halsey]. The Court finds by clear and convincing evidence, therefore, that [Halsey] suffered an aggravation of his old left knee injury by reason of the cumulative stresses placed on that knee as a result of the traumatic injury to his right knee while working for [the employer].
 "[Halsey] is 45 years old and is a high school graduate. While in the Air Force he performed clerical and secretarial type work. He is computer literate, can perform research on the Internet and word processing and, by his own admission, is capable of engaging in office work. Several of the exhibits admitted into evidence provide samples of [Halsey's] writing and written communication skills. He is right-hand dominant and has no impairment of his right shoulder, arm or hand. The only doctor-prescribed restrictions on his activities are that he not engage in repetitive squatting and climbing and that he limit his standing for prolonged periods of time. His intellectual functioning falls within the average range of intelligence. He is able to drive a motor vehicle. The Court is mindful that [Halsey] wears braces on both knees and is not pain free. He is currently receiving Social Security disability benefits. This fact, however, is not material to the issues before the Court because the Social Security determination is based on grids, guidelines, and regulations that do not apply in a workers' compensation case and may take into consideration health problems other than the work-related injuries sustained by [Halsey] on December 9, 1999.
 "Taking all the evidence into consideration, including [Halsey's] credibility as a witness and his demeanor during the trial, the Court is reasonably satisfied that he is permanently physically impaired as a result of his December 9, 1999, injuries. The Court does not find, however, that he is totally disabled from engaging in any gainful employment for which he is qualified by education and experience. While [Halsey] clearly has some physical limitations due to his right knee injury, those limitations would not prevent him from performing sedentary or light duty work for which he is qualified. Being mindful that his access to the competitive labor market has been reduced on account of his on-the-job injuries, the Court concludes that [Halsey] has sustained a 70% permanent partial vocational impairment."
The trial court also determined that Halsey had received temporary total disability ("TTD") benefits beyond the date he had reached maximum medical improvement ("MMI"), and, accordingly, it awarded the employer a credit against the accrued permanent partial disability benefits Halsey was awarded. On June 13, 2003, Halsey filed a postjudgment motion; the trial court denied the motion. Halsey appealed.
When this court reviews a trial court's factual findings in a workers' compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala. Code 1975. Substantial evidence is "evidence of such weight and quality that fair-minded persons *Page 1145 
in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Further, this court reviews the facts "in the light most favorable to the findings of the trial court." Whitsett v.BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App. 1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262
(Ala. 1996). A trial court's legal conclusions, however, are afforded no presumption of correctness, and this court reviews them de novo. Ex parte Cash, 624 So.2d 576 (Ala. 1993).
The testimony and evidence presented at trial indicate the following pertinent facts. At the time of trial, Halsey was 45 years old. Halsey graduated from high school. In 1975, Halsey entered the Air Force. While in the Air Force, Halsey performed secretarial/clerical duties for a colonel. At some point, Halsey injured his left knee while playing racquetball with the colonel. At that time, Halsey was assigned a 10% disability rating by the Veterans Administration (hereinafter "the VA") as a result of the injury to his left knee. In 1978, Halsey was honorably discharged from the Air Force. Halsey testified that he was not impaired by the injury to his left knee or placed on restrictions for the use of his left knee following his discharge from the Air Force.
Shortly after Halsey left the Air Force, he attended a four-year apprenticeship program in Florida to become a licensed journeyman electrician. Halsey was licensed as a journeyman electrician in Florida. At some point, Halsey moved to Alabama; however, he failed to receive a journeyman electrician license from the State of Alabama. After moving to Alabama, Halsey worked various jobs, including working as a facilities engineer at Three Springs School in Madison, and as the facility maintenance director for the YMCA in Huntsville. According to Halsey, he had worked as an electrician for approximately 20 years.
The record indicates that Halsey was hired by the employer on December 6, 1999, as a facility maintenance engineer. In that capacity, Halsey performed plumbing repairs, carpentry repairs, and minor electrical repairs. Halsey earned $12.50 per hour for a 40-hour work week. On December 9, 1999, Halsey was standing on a hydraulic lift to change ceiling tiles when the basket on top of the hydraulic lift wobbled, causing Halsey to lose his balance. Halsey testified that he grabbed the side of the lift with his left hand to prevent himself from falling. According to Halsey, his right leg slammed into the lift. Halsey testified that his right leg began to swell. Halsey reported the injury to his immediate supervisor and went to the emergency room for treatment that same day. Halsey was referred to Dr. Jack W. Moore for further treatment.
Halsey testified that Dr. Moore performed arthroscopic surgery on his right knee in January 2000. Halsey stated that after that surgery he still had problems with his right knee, including pain, buckling, and swelling. Further, Halsey noted that after the surgery on his right knee he began having problems with his left knee that included pain, swelling, and buckling. According to Halsey, he could not bear weight on his right leg and, therefore, his left leg had to carry the burden. Halsey testified that Dr. Moore performed a second surgery on his right knee in May 2000.
Halsey testified that he has participated in physical therapy for both knees and that he takes Vioxx, an anti-inflammatory medication, for his knees. Halsey testified that in mid-2001 an orthopedic surgeon with the VA prescribed a brace for his left knee. According to Halsey, he also received *Page 1146 
treatment for his left knee at the VA that included prescription pain medication and injections. Halsey testified that he wears braces on both knees.
Halsey testified that, on his fourth visit with Dr. Moore, he reported problems with his left shoulder. Halsey testified that Dr. Moore injected his shoulder with cortisone and ordered physical therapy. Halsey noted that the employer's workers' compensation carrier refused to authorize physical therapy for his shoulder. Halsey testified that he received treatment from the VA for his shoulder that included cortisone injections and physical therapy. According to Halsey, he has been diagnosed with arthritis in his left shoulder since the accident and cannot lift his left arm over his head. Halsey testified that his private physician prescribed a muscle relaxer for his shoulder and Bupap, a prescription medication, for tension headaches that Halsey claimed were associated with his injuries.
Dr. Moore testified by deposition that he first treated Halsey on December 13, 1999. Dr. Moore noted that Halsey presented with classic physical symptoms of a meniscus tear in his right knee. An MRI confirmed a tear of the meniscus of Halsey's right knee, and, on January 7, 2000, Dr. Moore performed arthroscopic surgery on Halsey's right knee. Dr. Moore testified that Halsey had a "buckle-handle" tear that is typically treated by trying to repair the tear during surgery. Dr. Moore testified that the surgery went well and that he ordered Halsey to attend physical therapy. On February 24, 2000, Dr. Moore saw Halsey for a check-up and noted that Halsey was complaining of pain over his "medial aspect."
Dr. Moore saw Halsey again on March 15, 2000, and noted that Halsey's pain in his right knee was improving but that Halsey now complained of pain in his left shoulder. Dr. Moore testified that he treated Halsey for a shoulder strain at that time with an injection to help clear the bursitis and inflammation in the shoulder. Dr. Moore opined that the shoulder injury was related to Halsey's December 9, 1999, accident because there was no other history of trauma that could have caused the shoulder injury. Dr. Moore stated that his impression of the shoulder injury was that Halsey had a rotator-cuff strain with a secondary impingement. Dr. Moore testified that the employer's workers' compensation carrier had not approved treatment of the shoulder injury as of May 2000. According to Dr. Moore, Halsey's shoulder injury could get worse if left untreated and could ultimately require surgical intervention to repair the damage. Dr. Moore testified that he had not assigned a permanent impairment rating as a result of Halsey's shoulder injury.
Dr. Moore testified that Halsey complained of pain in his right knee during his April and May 2000 office visits. In May, Halsey complained of continued pain over his "medial aspect." Dr. Moore ordered a second MRI, which indicated incomplete healing. On May 25, 2000, Dr. Moore performed a second arthroscopic surgery on Halsey's right knee to remove a portion of Halsey's meniscus. Dr. Moore testified that Halsey reached MMI for his right knee on August 23, 2000. Dr. Moore assigned a 2% impairment rating to the right leg and a 1% impairment rating to the body as a whole pursuant to the American Medical Association Guidelines.
According to Dr. Moore, during his treatment of Halsey, Halsey complained of problems with his left knee. Dr. Moore was aware of Halsey's prior injury to his left knee. Dr. Moore testified that it was typical for an injured person to shift weight to the healthier leg and, therefore, aggravate a previous problem on the opposite *Page 1147 
extremity. According to Dr. Moore, Halsey's injury to his right knee aggravated the prior injury to his left knee. Dr. Moore generally noted that it was not unusual to see delays in reporting additional injuries if a person suffered from another prominent injury.
Dr. Moore characterized the result of the second surgery to Halsey's right knee as poor. Dr. Moore noted that, in light of the partial meniscectomy, he would have expected more improvement. Dr. Moore testified that he last saw Halsey on February 12, 2001, and that, at that time, he noted that there was no improvement to the right knee and ordered Halsey to continue physical therapy. Dr. Moore testified that he did not assign Halsey any work restrictions because Halsey was not working at the time. However, Dr. Moore testified that Halsey would be restricted, in the future, from repetitive squatting and climbing because of his injury. Dr. Moore also testified that Halsey's participation in standing activities would be limited.
According to Halsey, the injuries to his knees and shoulder have limited his level of activity, and he is now sedentary. Halsey noted that he has gained 60 pounds since the December 9, 1999, accident. Halsey testified that his legs swell up if he stands for longer than one hour. Halsey stated that he elevates his legs at least once per day and applies ice to his knees at least twice per day.
Halsey testified that he has not worked since the December 9, 1999, accident. In June 2000, Halsey's employment with the employer was terminated.[1] Halsey received $335.35 per week in TTD benefits through December 20, 2001. Halsey testified that the only benefits he has received from the employer since he received his last TTD check are a paid prescription for Vioxx and a new knee brace for his right knee. The record indicates that on April 13, 2001, the VA increased the percentage of his disability award from 10% to 20% in connection with the injury to his left knee. Halsey testified that he applied for and now receives Social Security disability benefits.
Halsey testified that since the December 9, 1999, accident he had been offered a job with the City of Huntsville as an electrical inspector. Halsey testified that he had to turn down that offer of employment because Dr. Moore had not released him to return to work. According to Halsey, he had been offered other jobs, but he could not remember with whom. Halsey testified that he had not been offered a job since he last saw Dr. Moore on August 23, 2000. Halsey testified that he can drive a vehicle and that he is capable of doing office work.
Two vocational experts evaluated Halsey to determine his potential vocational disability. John W. McKinney III, a certified rehabilitation counselor, performed a functional capacity evaluation on Halsey. McKinney considered the injuries to Halsey's right knee and left shoulder. Following his evaluation, McKinney concluded that Halsey "was precluded from performing future employment above a very restricted range at the limited light exertion level." McKinney determined that Halsey had lost access to 90% of the employment positions previously available to him and that he was 100% vocationally disabled.
Martha Daniel, a vocational consultant, administered a Kaufman Brief Intelligence Test in conjunction with her evaluation of Halsey. The results of that test indicated *Page 1148 
that Halsey is of "average" intelligence. Daniel also considered the injuries to Halsey's knees and the injury to his left shoulder. According to Daniel, a transferable-skill analysis performed in the Morgan County labor market indicated that Halsey lost access to approximately 52% of the jobs available to him before his injury. Daniel determined that Halsey was 56% vocationally disabled.
On appeal, Halsey raises several issues. We find that the resolution of the following issue is dispositive. Halsey maintains on appeal that the trial court erred by awarding him permanent partial disability benefits before he had reached MMI on all of the injuries he sustained as a result of the December 9, 1999, accident. It is well settled that in order for an employee to recover permanent partial or permanent total disability benefits the employee must have reached MMI. Ex partePhenix Rental Ctr., 873 So.2d 226 (Ala. 2003); Hillery v.MacMillan Bloedel, Inc., 717 So.2d 824 (Ala.Civ.App. 1998);Edward Wiggins Logging Co. v. Wiggins, 603 So.2d 1094
(Ala.Civ.App. 1992); Pemco Aeroplex, Inc. v. Johnson,634 So.2d 1018 (Ala.Civ.App. 1994); and Alabama By-Products Corp. v.Lolley, 506 So.2d 343 (Ala.Civ.App. 1987). A claimant has reached MMI when "there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability." G.UB.MK. Constructors v. Traffanstedt,726 So.2d 704, 709 (Ala.Civ.App. 1998). When MMI is reached depends on the circumstances of the particular case. Hillery v. MacMillanBloedel, Inc., supra; Pemco Aeroplex, Inc. v. Johnson, supra.
In Avondale Mills, Inc. v. Gallups, 873 So.2d 237
(Ala.Civ.App. 2003), this court reversed the judgment of the trial court in which it prematurely determined that the employee had reached MMI on a certain date without testimony to support the determination that the worker had reached MMI. In Gallups, we held that "[w]ithout any definitive testimony to support that the worker had in fact reached MMI, . . . the trial court's assignment of the MMI date [is] without support."873 So.2d at 240.
In the case at bar, the only definitive testimony offered at trial that supported a determination that Halsey had reached MMI was the testimony of Dr. Moore that Halsey had reached MMI with regard to his right-knee injury on August 23, 2000. Halsey contends in his brief on appeal that he had not reached MMI as to all of his injuries. Our review of the record indicates that there was insufficient evidence presented to the trial court to support a conclusion that Halsey had reached MMI on all of the injuries he sustained as a result of his December 9, 1999, accident. Halsey himself failed to address the issue of whether he had reached MMI with regard to the injuries he sustained to his left shoulder and left knee.
Halsey contends that because there was little evidence on the issue of whether he had reached MMI, the trial court erred by making a final determination regarding compensability without reserving a ruling on any permanent disability associated with the injuries to his left shoulder and left knee. Halsey cites this court's decisions in BE K, Inc. v. Weaver, 743 So.2d 476
(Ala.Civ.App. 1999), and Ex parte DCH Regional Medical Center,571 So.2d 1162 (Ala.Civ.App. 1990), in support of his contention.
In DCH, supra, the employer paid TTD benefits to the employee for 15 months. Thereafter, the employer ceased paying further benefits. The employee sued to recover the discontinued payments. The trial court found in favor of the employee and ordered the employer to continue *Page 1149 
making weekly TTD payments until the employee had reached MMI and to pay all reasonable and necessary future medical expenses. The trial court retained jurisdiction to determine the issue of permanent loss of earning capacity. This court concluded that the trial court properly retained jurisdiction because the evidence in the record in that case indicated that the employee had not reached MMI and, therefore, the trial court could not have determined the extent of permanent disability at the time of the proceedings.
Similarly, in BE K, supra, the employer ceased paying TTD benefits after 13 months. The trial court ordered BE K to pay the benefits that were due and to pay weekly TTD benefits "`until further ordered by [the] court.'" 743 So.2d at 480. As in DCH, the evidence indicated that the employee in BE K had not yet reached MMI at the time of the proceedings. The trial court did not make a determination as to any permanent disability at the time it entered its judgment. This court concluded that the trial court's judgment was an appealable order.
In both DCH and BE K, the trial court properly reserved its finding of permanent disability until the employee reached MMI. In its May 14, 2003, judgment, the trial court in this case determined that the injuries to Halsey's left shoulder and left knee were compensable but found that there was insufficient evidence to determine the degree of permanency, if any, of the those injuries. The trial court then determined that Halsey had sustained a 70% permanent partial vocational impairment as a result of his "on-the-job injuries." Thus, it appears that the trial court considered all of Halsey's injuries in its award of permanent partial disability benefits. However, the trial court's determination of compensability and its award of permanent partial disability benefits are inconsistent with its finding that the evidence was insufficient to ascertain the permanency of the injuries to Halsey's left shoulder and left knee. Although we recognize that Halsey's failure to present evidence of whether he has reached MMI seems to border on invited error, the difficulty in this case is the contradictory findings in the trial court's judgment. We must reverse the trial court's judgment insofar as it awards permanent partial disability benefits.
Halsey also contends on appeal that he is entitled to TTD benefits until he reaches MMI on the remaining injuries to his left shoulder and left knee. This court has previously held that "the `time of temporary total disability' is the recovery period that lasts until maximum medical recovery is reached." Haywoodv. Russell Corp., 611 So.2d 365, 367 (Ala.Civ.App. 1992); DCH, supra. A trial court may award temporary partial or temporary total disability benefits before the determination of the extent of the permanent disability. § 25-5-57, Ala. Code 1975. As noted earlier, there was insufficient evidence before the trial court to determine whether Halsey had reached MMI as to his left-shoulder and left-knee injuries. Likewise, the record indicates that there was insufficient evidence presented to the trial court to determine if Halsey was entitled to temporary total or temporary partial disability benefits, if any, for the injuries he sustained to his left shoulder and left knee.
Given the contradictory findings in the trial court's judgment, the binding authority of Ex parte Phenix Rental Center, supra, and the cases relied on therein, we have no alternative but to reverse the judgment of the trial court. We remand this cause to the trial court for the limited purpose of making a determination of whether, or when, Halsey reached MMI, *Page 1150 
and whether he was entitled to any temporary disability benefits as a result of the injuries he sustained to his left shoulder and left knee.
Given this holding, we pretermit discussion of the remaining issues raised by Halsey on appeal.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., dissents, with writing.
[1] Pursuant to the employer's "Associate Work Rules, General Policies and Benefits" manual, an employee who does not return to work following a six-month leave of absence may be discharged.